## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

|  |  |
|---|---|
| DENISH BHAVSAR and SAMHITA GERA, derivatively on behalf of LUMINAR TECHNOLOGIES, INC., | Case No: |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. |  |
| MIKE MCAULIFFE, ALEC E. GORES, JUN HONG HENG, MARY LOU JEPSEN, SHAUN MAGUIRE, KATHARINE A. MARTIN, AUSTIN RUSSELL, MATTHEW J. SIMONCINI, and DANIEL D. TEMPESTA, |  |
| Defendants, |  |
| and |  |
| LUMINAR TECHNOLOGIES, INC., |  |
| Nominal Defendant. |  |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs Denish Bhavsar ("Bhavsar") and Samhita Gera ("Gera") ("Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of Nominal Defendant Luminar Technologies, Inc. ("Luminar" or the "Company"), file this Verified Shareholder Derivative Complaint against Mike McAuliffe

- 1 -

("McAuliffe"), Alec E. Gores ("Gores"), Jun Hong Heng ("Heng"), Mary Lou Jepsen ("Jepsen"), Shaun Maguire ("Maguire"), Katharine A. Martin ("Martin"), Austin Russell ("Russell"), Matthew J. Simoncini ("Simoncini"), and Daniel D. Tempesta ("Tempesta") (collectively, the "Individual Defendants," and together with Luminar, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Luminar, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and/or aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiffs' complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Luminar, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from February 28, 2023 to March 17, 2023, both dates inclusive (the "Relevant Period").

2.      Luminar represents itself to be "a global automotive technology company ushering in a new era of vehicle safety and autonomy." The Company's quarterly report filed on Form 10-Q with the SEC on August 8, 2023 represented that "[o]ver the past decade, Luminar has been building from the chip-level up, our light detection and ranging sensor, or lidar, . . . to enable next generation safety and autonomous capabilities for passenger and commercial vehicles as well as other adjacent markets." Lidar is a ranging device which measures the distance to a target by sending a short laser pulse and recording the time lapse between the outgoing light pulse and the detection of the reflected (back-scattered) light pulse.[1] Lidar is purportedly used to generate a 3-D map of a car's surroundings in real time, making it crucial for use in the autonomous driving industry.[2] Indeed, once a car can detect nearby objects, it can theoretically avoid hitting them.[3]

3.      Luminar purports to develop photonic integrated circuits ("PICs") for its semiconductor products. PICs are chips that use light waves to transfer and process

---

[1] https://www.synopsys.com/glossary/what-is-lidar.html
[2] https://www.cnbc.com/2023/07/24/luminar-technologies-austin-russell-how-self-driving-car-tech-works.html
[3] *Id.*

information.[4] As such, PICs are an integral component of Lidar technologies and essential for use in the autonomous driving industry.

4.      A major issue presently facing the development of Lidar technologies is growing costs and economies of scale associated with mass production. As a result, developing sleeker, smaller, and simpler Lidar components, such as PICs, has become a central focus for companies operating in the industry, including Luminar.

5.      In February 2023, the Company hosted its "Luminar Day" investor conference at its headquarters in Florida. During a presentation given at the event, the CEO of the Company's semiconductor subsidiary, Defendant McAuliffe, discussed Luminar's chip strategy. While Defendant McAuliffe presented, the Company displayed an image of its purported PIC technology in the presentation materials. The image depicted a PIC that was sleek, small, and simple and that appeared capable of reducing costs and enabling economies of scale for mass production of Lidar technologies.

6.      On March 17, 2023, *Forbes* published an article entitled "Lidar Maker Luminar Accused of Using Image of Rival's Chip in Investor Conference" in which it reported that semiconductor developer Lidwave, who was a major competitor of the Company, had accused Luminar of repeatedly misappropriating an image of

---

[4] https://www.photondelta.com/news/what-is-a-photonic-integrated-circuit/#:~:text=A%20photonic%20integrated%20circuit%20works,used%20to%20carry%20electrical%20signals.

Lidwave's PIC technology (the "Relevant Image"). The *Forbes* article disclosed that the Relevant Image was used during the Company's presentation given on Luminar Day, was used in materials on the Company's website, and was represented by the Individual Defendants as displaying the Company's PIC technology, not Lidwave's. Moreover, *Forbes* reported that Lidwave also threatened Luminar with legal action if the wrongful use of the Relevant Image was not rectified.

7.     On this news, the Company's stock price fell $0.78 per share, or 9.09% over two consecutive trading days, from closing at a price of $8.58 per share on March 16, 2023 to close at $7.80 per share on March 20, 2023.

8.     After Lidwave threatened Luminar with legal action, the Company removed the Relevant Image from its investor presentation and website materials and took down the YouTube video that displayed the Relevant Image.

9.     In amending the presentation materials, Luminar replaced the image of Lidwave's PIC, which was colorful, sleek, small, and simple, with an image of the Company's purported PIC technology. The replacement image was microscopic and black-and-white, making it unclear to investors whether the image was of the Company's entire PIC or just an individual part of it and further depicting a far less appealing, bulkier PIC than Lidwave's that was displayed in the Relevant Image.

10.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the

investing public materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (i) the Company attempted to pass off an image of a competitor's PIC as its own in order to market its products; (ii) such conduct created a significant risk for Luminar of litigation and/or regulatory enforcement actions; (iii) once revealed, the foregoing would detrimentally affect Luminar's business, reputation, and stock price; and (iv) the Company failed to maintain internal controls. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

11.    Additionally, in breach of their fiduciary duties, the Individual Defendants, during the Relevant Period, caused the Company to fail to maintain adequate internal controls.

12.    In light of the Individual Defendants' misconduct—which has subjected the Company and Defendant McAuliffe to a federal securities class action lawsuit pending in the United States District Court for the Middle District of Florida (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of

the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

13.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendant McAuliffe's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiffs

19.     Plaintiffs are current shareholders of Luminar. Plaintiffs have continuously held Luminar common stock since they purchased it on September 8, 2020.

### Nominal Defendant Luminar

20.     Nominal Defendant Luminar is a Delaware corporation with its principal executive offices at 2603 Discovery Drive, Suite 100, Orlando, Florida 32826. Luminar's common stock trades on the Nasdaq Stock Market ("NASDAQ") under ticker symbol "LAZR."

### Defendant McAuliffe

21.     Defendant McAuliffe has served as the Chief Executive Officer ("CEO") of the Company's semiconductor subsidiary, Luminar Semiconductors, since October 2022.

22.     In a press release issued on February 28, 2023, the Company stated the following about Defendant McAuliffe:

> At Luminar Day, the company also announced the combination of its chip design subsidiaries Black Forest Engineering, Optogration, and Freedom Photonics into a new unified entity, Luminar Semiconductor. Mike McAuliffe has joined as President of Luminar Semiconductor. Mike previously served as CEO of several advanced semiconductor and sensing companies, including Seeing Machines, a publicly-traded automotive semiconductor technology company.

**Defendant Gores**

23.     Defendant Gores has served as a Company director since December 2020.  According to the Schedule 14A the Company filed with the SEC on April 28, 2023 (the "2023 Proxy Statement"), as of February 28, 2023, Defendant Gores beneficially owned 5,155,719 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2023 was $8.95, Defendant Gores owned approximately $46 million worth of Luminar stock.

24.     For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Gores received $235,427 in total compensation from the Company. This included $53,000 in fees earned or paid in cash and $182,427 in stock awards.

25.     The 2023 Proxy Statement stated the following about Defendant Gores:

**Alec E. Gores** has served as a member of our board of directors since December 2020. Mr. Gores is the Founder, Chairman and Chief Executive Officer of The Gores Group, a global investment firm focused on acquiring businesses that can benefit from the firm's operating expertise. Mr. Gores implemented an operational approach to private equity investing when he founded The Gores Group in 1987 by operating businesses alongside management, or in some cases in lieu of management, to build value in those entities. Since then, the firm has acquired more than 120 businesses including a current portfolio of 8 active companies worldwide. Mr. Gores began his career as a self-made entrepreneur and operating executive. In 1978, he self-funded and founded Executive Business Systems (EBS), a developer and distributor of vertical business software systems. Within seven years, EBS had become a leading value-added reseller in Michigan and employed over 200 people. In 1986, CONTEL purchased EBS, and Mr. Gores subsequently began acquiring and operating non-core businesses from major corporations and building value in those entities, a decision that ultimately led to the founding of what has evolved into The Gores Group today. Under his leadership, The Gores Group has continued to acquire businesses in need of operational and financial resources, while creating value and working with management teams to establish an entrepreneurial environment as a foundation for sustainable growth. This philosophy has served the firm well. Mr. Gores served as the Chairman of the Board of Directors of Gores Holdings I from its inception in June 2015 until completion of the Hostess acquisition in November 2016, as the Chairman of the Board of Directors of Gores Holdings II since its inception in August 2016 until completion of the Verra acquisition in October 2018 and as the Chairman of the Board of Directors of Gores Holdings III since its inception in October 2017 until the completion of the PAE acquisition in February 2020, as the Chairman of the Board of Directors of Gores Holdings IV from June 2019 until the completion of the UWM acquisition in January 2021, as the Chairman of the Board of Directors of Gores Holdings V from June 2020 until the completion of the AMP acquisition in August 2021, as the Chairman of the Board of Directors of Gores Holdings VI from June 2020 until the completion of the Matterport acquisition in July 2021, and as Chairman of the Board of Directors of Gores Guggenheim from December 2020 until the completion of the Polestar acquisition in July 2022. Mr. Gores served as

the Chief Executive Officer and a Director of Gores Metropoulos II from July 2020 until the completion of the Sonder acquisition in January 2022. Mr. Gores served as the Chairman of the board of directors of Gores Holdings VII from September 2020, Gores Holdings VIII from September 2020, Gores Technology from December 2020, and Gores Technology II from December 2020, until their respective terminations in December 2022. Mr. Gores has served as the Chairman of the Board of Directors of Gores Holdings IX since January 2021 and Gores Holdings X since January 2021. Mr. Gores holds a degree in Computer Science from Western Michigan University. Mr. Gores' significant investment and financial expertise make him well qualified to serve as a member of our board of directors.

We believe Mr. Gores is qualified to serve on our board of directors based on his significant investment and financial expertise.

### Defendant Heng

26.    Defendant Heng has served as a Company director since June 2021. He also serves as a member of the Audit Committee and the Compensation & Human Capital Management Committee. According to the 2023 Proxy Statement, as of February 28, 2023, Defendant Heng beneficially owned 2,434,188 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2023 was $8.95, Defendant Heng owned approximately $22 million worth of Luminar stock.

27.    For the 2022 Fiscal Year, Defendant Heng received $249,594 in total compensation from the Company. This included $67,167 in fees earned or paid in cash and $182,427 in stock awards.

28.    The 2023 Proxy Statement stated the following about Defendant Heng:

***Jun Hong Heng*** has served as a member of our board of directors since June 2021 and is the Founder and the Chief Investment Officer of Crescent Cove Advisors, LP ("Crescent Cove") since August 2018. Mr. Heng is also the Founder of Crescent Cove Capital Management LLC and has served as its Chief Investment Officer since February 2016. Prior to Crescent Cove Capital Management LLC, Mr. Heng served as Principal of Myriad Asset Management, an investment firm, from August 2011 to January 2015, where he focused on Asian credit and equity, including special situations. From June 2008 to June 2011, he served as Vice President of Argyle Street Management, a spin-off from Goldman Sachs Asian Special Situations Group. Previously, Mr. Heng served as an analyst at Morgan Stanley, where he focused on Asia, and as an analyst at Bear, Stearns & Co., where he served in a multi-disciplinary role across technology, media and telecommunications, mergers and acquisitions, and equity and debt capital markets. Mr. Heng holds a B.B.A. in Finance and Accounting from the Stephen M. Ross School of Business at the University of Michigan. Mr. Heng also serves as an independent director on the board of ECARX.

We believe Mr. Heng is qualified to serve as a director based on his extensive investment and financial expertise.

### Defendant Jepsen

29.     Defendant Jepsen has served as a Company director since February 2021. She also serves as Chair of the Nominating & ESG Committee and as a member of the Compensation & Human Capital Management Committee. According to the 2023 Proxy Statement, as of February 28, 2023, Defendant Jepsen beneficially owned 31,784 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2023 was $8.95, Defendant Jepsen owned approximately $284,467 worth of Luminar stock.

30.     For the 2022 Fiscal Year, Defendant Jepsen received $249,788 in total compensation from the Company. This included $67,361 in fees earned or paid in cash and $182,427 in stock awards.

31.     The 2023 Proxy Statement stated the following about Defendant Jepsen:

***Mary Lou Jepsen, PhD*** has served as a member of our board of directors since February 2021. Dr. Jepsen has served as the CEO, Founder and Chairperson of the board of directors of Openwater, a San Francisco based medical diagnostics and therapeutic wearable device technology company, since August 2016. Previously, Dr. Jepsen served as the Executive Director of Engineering at Facebook, Inc. and Head of Display Technologies at Oculus from January 2015 to August 2016, and before that served a similar role at Google, Inc. and X (formerly Google X) from 2012 to 2015. She also co-founded and served as the Chief Technology Officer of One Laptop per Child, a nonprofit organization, of which she was the lead architect designing $100 laptops that were shipped to millions of children in the developing world. Dr. Jepsen has served on the board of directors of Lear Corporation ("Lear"), a leading, global tier-1 automotive components supplier, since March 2016. Dr. Jepsen holds a Ph.D. degree from Brown University in Optical Sciences, an M.S. from Massachusetts Institute of Technology in Visual Studies and a Sc.B. from Brown University in Electrical Engineering and Studio Art.

We believe Dr. Jepsen is qualified to serve on our board of directors based on her exceptional track record of leadership and innovation including her senior management experience in the technology industry and as a board member of a publicly traded company.

## Defendant Maguire

32.     Defendant Maguire has served as a Company director since June 2021. He also serves as a member of the Nominating & ESG Committee. According to the 2023 Proxy Statement, as of February 28, 2023, Defendant Maguire beneficially

owned 16,560 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2023 was $8.95, Defendant Maguire owned approximately $148,212 worth of Luminar stock.

33.     For the 2022 Fiscal Year, Defendant Maguire received $243,990 in total compensation from the Company. This included $61,563 in fees earned or paid in cash and $182,427 in stock awards.

34.     The 2023 Proxy Statement stated the following about Defendant Maguire:

> **Shaun Maguire, PhD** has served as a member of our board of directors since June 2021 and is currently a General Partner at Sequoia Capital. Prior to joining Sequoia Capital in 2019, Dr. Maguire served as Co-Founder and Chairman of Expanse (formerly known as Qadium) from May 2012 to December 2020, when Expanse was acquired by Palo Alto Networks. Dr. Maguire also served as Partner of GV from 2016 to 2019, Co-Founder of Escape Dynamics, Inc. from 2010 to 2015, Consultant at the Defense Advanced Research Projects Agency from 2011 to 2012 and a member of the Algorithmic Trading Group at the DRW Trading Group in 2008. Dr. Maguire serves on the boards of Vise, AMP Robotics, Gather. Town and Knowde. Dr. Maguire received his Ph.D. in Physics from the California Institute of Technology, M.S. in Control and Dynamical Systems from the California Institute of Technology, M.S. in Statistics from Stanford University and B.A. in Mathematics from the University of Southern California.

> We believe that Dr. Maguire is qualified to serve as a director because of his significant investment, cybersecurity and technology expertise, which enables him to bring to the board of directors unique perspectives as well as valuable insights and experience.

**Defendant Martin**

35.     Defendant Martin has served as a Company director since February 2021. She also serves as Chair of the Compensation & Human Capital Management Committee and as a member of the Nominating & ESG Committee. According to the 2023 Proxy Statement, as of February 28, 2023, Defendant Martin beneficially owned 32,675 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2023 was $8.95, Defendant Martin owned approximately $292,441 worth of Luminar stock.

36.     For the 2022 Fiscal Year, Defendant Martin received $257,427 in total compensation from the Company. This included $75,000 in fees earned or paid in cash and $182,427 in stock awards.

37.     The 2023 Proxy Statement stated the following about Defendant Martin:

*Katharine A. Martin* has served as a member of our board of directors since February 2021. Ms. Martin is the Chairperson of the board of directors of Wilson Sonsini Goodrich & Rosati and a partner of such firm. Prior thereto, Ms. Martin was a partner of Pillsbury Madison & Sutro LLP. Ms. Martin also serves on the board of directors of WildAid, a nonprofit organization, and YMCA of Silicon Valley, a nonprofit organization. She previously served on the board of directors of Nuance Communications, a technology pioneer and market leader in conversational artificial intelligence and ambient clinical intelligence, from 1999 to 2018. Ms. Martin has over thirty-five years' experience practicing corporate and securities law, and has extensive experience representing public companies. Ms. Martin holds a J.D. from McGeorge School of Law and an undergraduate degree in Anthropology from the University of California, Berkeley.

We believe Ms. Martin is qualified to serve on our board of directors

based on her legal and business background including her senior management experience.

**Defendant Russell**

38.     Defendant Russell is the founder of Luminar and has served as the Company's President, CEO, and Chairperson of the Board since December 2020 and prior to this, served as President and CEO of Legacy Luminar[5] and as a member of its board of directors since founding Legacy Luminar in 2012. According to the 2023 Proxy Statement, as of February 28, 2023, Defendant Russell beneficially owned 1,030,000 shares of the Company's Class A stock and 97,088,670 shares of the Company's Class B stock, giving him 78.2% of the total voting power with respect to all shares of Class A common stock and Class B common stock, as a single class. Given that the price per share of the Company's common stock at close of trading on February 28, 2023 was $8.95, Defendant Russell owned approximately $9.2 million worth of Luminar stock.

39.     For the 2022 Fiscal Year, Defendant Russell received $93,915,469 in total compensation from the Company. This included $1 in salary and $93,915,468 in stock awards.

40.     The 2023 Proxy Statement stated the following about Defendant Russell:

---

[5] The Company is the result of a business combination that closed on December 2, 2020 (the "Business Combination") between pre-Business Combination Luminar Technologies, Inc. ("Legacy Luminar") and Gores Metropoulos, Inc., a special purpose acquisition company.

*Austin Russell* has served as our President and Chief Executive Officer and as Chairperson and member of our board of directors since December 2020 and prior to this, served as President and Chief Executive Officer of Legacy Luminar and as a member of its board of directors since founding Legacy Luminar. Mr. Russell developed his first visioning system at age eleven by building prototype supercomputers and optoelectronic systems with real-world applications in mind. He wrote his first patent application at 12, and over the next four years worked on a host of photonics and imaging related technologies before he later became an independent researcher at the Beckman Laser Institute. After being recruited to Stanford for Applied Physics, he was awarded the Thiel Fellowship at 17 to pursue Legacy Luminar full-time with a vision to develop a new kind of sensing technology to make autonomous vehicles both safe and ubiquitous.

We believe that Mr. Russell is qualified to serve on our board of directors because he is our founder, our largest stockholder and has the long-term vision for Luminar and due to his operational and historical expertise gained from serving as Legacy Luminar's President and Chief Executive Officer since Legacy Luminar's inception.

### Defendant Simoncini

41.     Defendant Simoncini has served as a Company director since December 2020. He also serves as Chair of the Audit Committee and as a member of the Compensation & Human Capital Management Committee. According to the 2023 Proxy Statement, as of February 28, 2023, Defendant Simoncini beneficially owned 306,126 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2023 was $8.95, Defendant Simoncini owned approximately $2.7 million worth of Luminar stock.

42.     For the 2022 Fiscal Year, Defendant Simoncini received $267,427 in total compensation from the Company. This included $85,000 in fees earned or paid in cash and $182,427 in stock awards.

43.     The 2023 Proxy Statement stated the following about Defendant Simoncini:

> ***Matthew J. Simoncini*** has served as a member of our board of directors since December 2020 and previously served on Legacy Luminar's board of directors since June 2020. Mr. Simoncini previously served on the boards of directors of Cooper-Standard Holdings Inc., a leading global supplier of systems and components for the automotive industry, from August 2018 to May 2020, and Kensington Capital Acquisition Corp., a special purpose acquisition company focused on companies in the automotive sector, from June 2020 to December 2022. From September 2011 until his retirement in February 2018, Mr. Simoncini served as President and Chief Executive Officer and as a member of the board of directors of Lear Corporation ("Lear"), a global automotive technology company, and he served as Chief Financial Officer of Lear from September 2007 to September 2011. Mr. Simoncini joined Lear in May 1999 after Lear acquired UT Automotive, a supplier of electronic and interior products for the auto industry, where he served as Director of Global Financial Planning & Analysis from April 1996 to May 1999. Mr. Simoncini holds a B.A. in business administration and an Honorary Doctorate of Law from Wayne State University.
>
> We believe Mr. Simoncini is qualified to serve on our board of directors based on his extensive executive leadership and management experience and his significant strategic and financial expertise in the automotive and automotive-related industries.

**Defendant Tempesta**

44.     Defendant Tempesta has served as a Company director since August 2022. He also serves as a member of the Audit Committee. According to the 2023

Proxy Statement, as of February 28, 2023, Defendant Tempesta beneficially owned 63,320 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2023 was $8.95, Defendant Tempesta owned approximately $566,714 worth of Luminar stock.

45.     For the 2022 Fiscal Year, Defendant Tempesta received $522,638 in total compensation from the Company. This included $22,928 in fees earned or paid in cash and $499,710 in stock awards.

46.     The 2023 Proxy Statement stated the following about Defendant Tempesta:

> **Daniel D. Tempesta** has served as a member of our board of directors since August 2022. Mr. Tempesta is executive vice president and chief financial officer of Nuance Communications, Inc., a technology pioneer with market leadership in conversational AI and ambient intelligence. His responsibilities include oversight of Nuance's finance and accounting operations, as well as tax, treasury, investor relations, order management, and procurement. Nuance was acquired by Microsoft Corporation in March 2022. Prior to joining Nuance in 2008, Mr. Tempesta was the corporate controller and chief accounting officer at Teradyne, Inc. He began his career with PricewaterhouseCoopers LLP, where he held a number of roles in the assurance practice serving technology clients.
>
> We believe Mr. Tempesta is qualified to serve on our board of directors due to his extensive financial expertise and executive leadership experience.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

47.     By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs

- 19 -

of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

48.    Each director and/or officer of the Company owes to Luminar and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

49.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein or aided and abetted the same.

50.    To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

51.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants at Luminar had a duty

to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

52.    To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and/or directors of the Company were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Florida, and the United States, and pursuant to Luminar's own Code of Business Conduct and Ethics (the "Code of Conduct").

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to

avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

53.     Each of the Individual Defendants further owed to the Company and its shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

54.     At all times relevant hereto, the Individual Defendants at Luminar were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

55.     Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had access to adverse, non-public information about the Company.

56.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

57.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein.   The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

58.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

59.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of

Luminar's board of directors, each of the Individual Defendants who was a director of Luminar was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

60.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

61.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and/or of the Company and was at all times acting within the course and scope of such agency.

## LUMINAR'S CODE OF CONDUCT

62.     Pursuant to the Company's Code of Conduct, "[a]ll directors, officers and employees of the Company are required to be familiar with this Code, comply with its provisions, and report any suspected violations as described below."

63.     According to the Code of Conduct, its purpose is to:

• promote honest and ethical conduct, including the ethical handling of conflicts of interest;

• promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the U.S. Securities and Exchange Commission (the "SEC") and in other public communications made by the Company;

• promote compliance with applicable governmental laws, rules and regulations;

• promote the protection of Company assets, including corporate opportunities and confidential information;

• promote fair dealing practices;

• deter wrongdoing; and

• ensure accountability for adherence to the Code.

64.     Regarding "Core Values," the Code of Conduct provides the following,

in relevant part:

> Luminar is committed to serving its customers and employing individuals with personal standards consistent with that of the Company's standards of integrity, professionalism, and commitment to superior results. These standards create a foundation of trust and success that is reflected in the Company's relationships with customers, suppliers, stockholders, and one another.

65.     Regarding "Honest and Accurate Disclosures," the Code of Conduct

provides the following, in relevant part:

> The Company strives to maintain integrity of the Company's records and public disclosures. The Company's corporate and business records, including all supporting entries to the Company's books of account, must be completed honestly, accurately and understandably. The Company's records are important to investors and creditors. They serve as a basis for managing the Company's business and are important in meeting the Company's obligations to business partners, suppliers, vendors, creditors, employees and others with whom the Company does business.

The Company depends on the books, records and accounts accurately and fairly reflecting, in reasonable detail, the Company's assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

To help ensure the integrity of the Company's records and public disclosure, the Company requires that:

> • no entry be made in the Company's books and records that is intentionally false or misleading;

> • transactions be supported by appropriate documentation;

> • the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in the Company's books and records;

> • employees comply with the Company's system of internal controls and be held accountable for their entries;

> • any off-balance sheet arrangements of the Company are clearly and appropriately disclosed;

> • employees work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure documents;

> • no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; and

> • records be retained or destroyed according to the Company's document retention policies or procedures then in effect.

66. Regarding "Protection and Proper Use of Company Assets," the Code of Conduct provides the following:

All directors, officers and employees should protect the Company's assets and ensure their reasonable and efficient use. Theft, carelessness, and

waste have a direct impact on the Company's profitability and are prohibited.

All Company assets should be used only for legitimate business purposes, though incidental personal use is permitted. Employees should have no reasonable expectation of privacy when using Company assets; the Company has the right to inspect the assets at its sole discretion, for any reason. Any suspected incident of fraud or theft should be reported for investigation immediately.

The obligation to protect Company assets includes the Company's proprietary information. Proprietary information includes intellectual property such as trade secrets, patents, trademarks, and copyrights, as well as business and marketing plans, engineering and manufacturing ideas, designs, databases, records and any nonpublic financial data or reports. Unauthorized use or distribution of this information is prohibited and could also be illegal and result in civil or criminal penalties. Refer to the Luminar's Confidential Information and Invention Assignment Agreement that you signed for additional information.

67. In a section titled "Media Contacts and Public Communications," the Code of Conduct provides the following:

It is the Company's policy to disclose material information concerning the Company to the public only in accordance with the Company's Third Party Communications, Media, and Social Media policies in order to avoid inappropriate publicity and to ensure that all such information is communicated in a way that is reasonably designed to provide broad, non-exclusionary distribution of information to the public. Only those individuals designated as official spokespersons in the Company's Third Party Communications, Media, and Social Media policies may address questions regarding financial matters. Please see these policies for additional information.

68. In violation of the Code of Conduct, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially

false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and aiding and abetting thereof. Also in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## LUMINAR'S AUDIT COMMITTEE CHARTER

69.     The Company also maintains an Audit Committee Charter (the "Charter"). According to the Charter, the purpose of the Audit Committee is to, *inter alia*:

> [A]ssist the Board of Directors (the "Board") of Luminar Technologies, Inc. (the "Company") in fulfilling its oversight responsibilities with respect to: (i) the integrity of the financial reports and other financial information provided by the Company to its stockholders and others; (ii) the Company's financial policies and procedures and disclosure controls and procedures; (iii) the Company's system of internal control over financial reporting; (iv) the Company's auditing, accounting and financial reporting processes; (v) the qualifications and independence of the Company's independent registered public accounting firm ("independent accountants"); (vi) the performance of the Company's internal audit function (the "Internal Auditor"); and (vii) the Company's financial and operational risk management (unless delegated to a separate committee of the Board). The Committee shall also review and approve related-party transactions (as defined and if required by applicable law, including rules of the Securities and Exchange Commission ("SEC") and the listing standards of The Nasdaq Stock Market LLC ("Nasdaq")). The Committee further aids the Board in its oversight of the Company's tax, legal, regulatory, information security

and ethical compliance and the Company's processes and assessments with respect to the Company's management of risk. Moreover, the Committee prepares the report of the Audit Committee that SEC rules require to be included in the Company's annual proxy statement.

In carrying out this function, the Committee shall: (i) serve as an independent and objective party to oversee the Company's financial reporting process and internal control system; (ii) review and evaluate the qualifications and independence of the Company's independent accountants; (iii) approve all audit and permissible non-audit services provided by the Company's independent accountants; (iv) review and evaluate the performance of the Company's independent accountants and the Internal Auditor; and (v) facilitate open communication among the independent accountants, financial and senior management, legal counsel, the Internal Auditor, head of ethics and compliance and the Board.

The Committee will fulfill its oversight role primarily by carrying out the activities enumerated in the "Responsibilities and Duties" section of this Charter.

70.     In a section titled "Documents/Reports Review," the Charter states that

the Audit Committee's responsibilities shall, *inter alia*, include the following:

1. Review with senior financial management and the independent accountants prior to filing the Company's interim financial information, earnings press release and the financial information contained in the Company's quarterly reports on Form 10-Q, including: (i) the selection, application and disclosure of the critical accounting policies and practices used; and (ii) any management certifications related thereto. The Committee Chair may represent the Committee for purposes of this review.

2. Review the Company's annual financial statements and any other reports or financial information contained in the Company's Annual Reports on Form 10-K, including: (i) the selection, application and disclosure of the critical accounting policies and practices used; (ii) any management certifications related thereto; and (iii) any certification, report, opinion or review rendered by the independent accountants.

3. Prepare the report of the Committee required by SEC rules to be included in the Company's proxy statement for each annual meeting.

4. Review any reports submitted by the independent accountants, including a report, if prepared, relating to: (i) all critical accounting policies and practices used; (ii) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent accountants; and (iii) other material written communications between the independent accountants and management, such as any management letter or schedule of unadjusted differences, and discuss with the independent accountants any critical audit matters arising from the current period audit.

5. At least annually, obtain and review a report by the independent accountants describing: (i) the independent accountants' internal quality control procedures; (ii) any material issues raised by the most recent internal quality control review, or peer review, of the independent accountants, or by any inquiry or investigation by governmental or professional authorities, within the preceding five (5) years, with respect to one or more independent audits carried out by the independent accountants, and any steps taken to address any such issues; and (iii) all relationships between the independent accountants and the Company (to assess the independent accountants' independence).

6. Review and reassess the adequacy of this Charter at least annually, recommend to the Board appropriate changes to the Charter, and assure that the Charter as may be amended is either (i) posted on the Company's website or (ii) included as an appendix to the annual stockholders' meeting proxy statement at least once every three (3) years.

71.     In a section titled "Other Responsibilities," the Charter states that the

Audit Committee's responsibilities shall, *inter alia*, include the following:

1. Oversee and review periodically with management the Company's policies relating to finance, capital expenditures, investment, asset management, information management, and the security of its intellectual and physical assets.

2. Oversee financial-related risks, including risk assessment, major risk exposures and the steps management has taken to monitor and mitigate those exposures, but excluding the enterprise risks over which other Board committees have oversight responsibility.

3. On behalf of the Board and unless delegated to a separate committee of the Board: (i) periodically receive reports from management to help fulfill the Committee's duties to oversee the principal risk exposures facing the Company and the Company's mitigation efforts in respect of such risks, including the Company's procedures and any related policies concerning risk assessment and risk management; and (ii) review the Company's risk management framework and programs, the Company's adherence to risk limits and its established risk appetite, and the framework by which management discusses the Company's risk profile and risk exposures with the Board and its committees, and on an annual basis recommend to the Board the articulation and establishment of the Company's risk appetite.

4. Oversee the Company's business continuity and disaster preparedness planning.

5. Review with management other finance, tax, legal and/or administrative issues that the Committee or the Board deems necessary or appropriate.

6. Make reports and recommendations to the Board on matters within the scope of its functions.

7. Review and approve all related-party transactions for which audit committee approval is required by applicable law (including SEC and Nasdaq rules).

8. Retain and consult with independent counsel and other advisors, as it deems necessary or appropriate to carry out its duties, with funding provided by the Company.

9. Assess the effectiveness of the Audit Committee. In addition to the activities described above, the Committee may perform such other functions as are consistent with its purpose and necessary or appropriate under applicable law, the Company's charter and/or Bylaws, and the resolutions and other directives of the Board.

72.     In a section titled "Legal and Ethical Compliance," the Charter states that the Audit Committee's responsibilities shall, *inter alia*, include the following:

1. Oversee and review periodically with management, legal counsel, the head of Ethics and Compliance, and other experts, as appropriate, the programs and policies of the Company designed to ensure compliance with applicable laws and regulations, including compliance with financial crimes laws and regulations, the Foreign Corrupt Practices Act, foreign anti-corruption laws, and export control regulations, and with the Company's ethical standards, and the results of these compliance efforts. Review, investigate and recommend to the Board actions the Committee deems appropriate to be taken in connection with any matters pertaining to the integrity of the Company's executive officers (as determined under Rule 16a-1(f) of the Exchange Act), including conflicts of interest and adherence to standards of business conduct, as required by the policies of the Company.

2. Oversee the ethics and compliance process as a procedure for receiving, retaining and treating complaints or concerns, including confidential and anonymous submissions received 6 by the Company regarding accounting, internal accounting controls, auditing or other matters in compliance with applicable law (including SEC rules).

3. Review periodically with management, legal counsel and other experts, as appropriate, any legal and regulatory matters that may have a material impact on the financial statements.

4. Coordinate with the Nominating & ESG Committee and the Compensation & Human Capital Management Committee to oversee

the Company's ESG reporting requirements and help set up processes to ensure that ESG disclosures comply with applicable laws, regulations and internal control practices.

73. In violation of the Charter, Defendants Simoncini, Heng, and Tempesta failed to adequately exercise their risk management and risk assessment functions and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

74. Luminar purports to be a global automotive technology company focusing on the development of Lidar technologies and the semiconductor products, PICs, that are used therein.[6] Lidar is a ranging device which measures the distance to a target by sending a short laser pulse and recording the time lapse between the outgoing light pulse and the detection of the reflected (back-scattered) light pulse.[7] Lidar is purportedly used to generate a 3-D map of a car's surroundings in real time, making it crucial for use in the autonomous driving industry.[8] Indeed, once a car can detect nearby objects, it can theoretically avoid hitting them.[9] PICs are chips that use

---

[6] https://velodynelidar.com/what-is-lidar/
[7] https://www.synopsys.com/glossary/what-is-lidar.html
[8]https://www.cnbc.com/2023/07/24/luminar-technologies-austin-russell-how-self-driving-car-tech-works.html
[9] *Id.*

light waves to transfer and process information.[10] As such, PICs are an integral component of Lidar technologies and are essential for use in the autonomous driving industry. The Company's core technology is perception software for passenger cars and commercial trucks in domestic and international markets, with Luminar particularly focused on the development of Lidar technologies and PICs to be used in automated vehicles.

75.    A major issue presently facing the development of Lidar technologies is growing costs and economies of scale associated with mass production. As a result, developing sleeker, smaller, and simpler Lidar components, such as PICs, has become a central focus for companies operating in the autonomous driving industry, including Luminar.

**<u>Materially False and Misleading Statements</u>**

76.    The Relevant Period begins on February 28, 2023 when Luminar hosted its Luminar Day investor conference. During the conference, the Company gave presentations discussing Luminar's chip strategy for development of its Lidar technologies. During the presentation, Luminar displayed an image of a PIC (represented below) which appeared elegant, sleek, small, simple in design, and capable of driving down economies of scale and reducing costs associated with the

---

[10]https://www.photondelta.com/news/what-is-a-photonic-integrated-circuit/#:~:text=A%20photonic%20integrated%20circuit%20works,used%20to%20carry%20electrical%20signals.

mass production of Lidar technologies. During the conference, the Company falsely represented to investors that the image of the PIC used in the presentation was Luminar's own technology and design. In actuality, the PIC image displayed by Luminar depicted the PIC technology of the Company's competitor, Lidwave:



(The relevant image of the PIC appears as the rightmost image at the bottom of the above investor presentation slide.)

77.    In addition to highlighting it at Luminar Day, the Company displayed the image of Lidwave's PIC in investor presentation materials posted to Luminar's website and via a live and recorded webcast of the Luminar Day conference posted on Youtube. However, the Company repeatedly failed to attribute the foregoing PIC image to Lidwave, instead continuously representing to the investing public that the PIC image was of the Company's own technology.

78.     At Luminar Day, Defendant McAuliffe, referencing the presentation slide, touted the development of Luminar's  Lidar and Lidar-enabling technologies, including its PICs, which Defendant McAuliffe represented could effectively solve many of the major economic and complexity issues associated with the mass production of Lidar and Lidar-enabling technologies. Specifically, when referencing the slide containing the Relevant Image—and, notably, without referencing Lidwave—Defendant McAuliffe stated the following, in relevant part:

> We only focus on the hardest photon processing problems-generation, detection, and processing. This is what LIDAR is. It's one of the biggest, most difficult physics problems today, with other customers solving similar, very difficult photonic problems. So, we can now take the same platforms, the same products, closely aligned, and leverage that across multiple markets. We solve 1550. There is a general perception that 1550 is an expensive, traditionally an expensive process and it's maybe a drawback. That is not the case. We have solved that problem through, number one, architecture, as Jason described, number two, advanced packaging, and number three, we can drive the economies of scale and the economics associated with that by leveraging both Luminar volume and volume to the wider market. So, we're shifting gears, we're shifting gears to take what has been a sub-scale industry, sub-scale ecosystem, and industrializing that at scale. And we need to do that. We need to do that both for the economics and for the size, weight, and cost in order to deliver LIDAR at millions of units. And as an example, the other key advantage of siliconization is this: people think that maybe the biggest advantage is you control your own supply chain, that's true, you can control the quality, that's true, you can control the performance, that's true. But the biggest advantage of siliconization, in general, is you can take a lot of complexity and cost out of the product—complexity in cabling, complexity in optics, complexity in electromechanical. So, anything you can put in silicon, you can put in silicon. And I think we can see from other industry leaders, like big fruit companies, that owning that stack and internalizing and siliconizing anything you can delivers

elegant architectures, breakthrough performance, and breakthrough economics.

79.     The above statements identified in ¶¶ 76-78 were materially false and misleading because Defendants failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and omissions which failed to disclose that: (i) the Company attempted to pass off an image of a competitor's PIC as its own in order to market its products; (ii) such conduct created a significant risk for Luminar of litigation and/or regulatory enforcement actions; (iii) once revealed, the foregoing would detrimentally affect Luminar's business, reputation, and stock price; and (iv) the Company failed to maintain internal controls. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Emerges

80.     The truth emerged on March 17, 2023 when *Forbes* published an article entitled "Lidar Maker Luminar Accused of Using Image of Rival's Chip In Investor Conference" reporting that competitor semiconductor developer, Lidwave, had accused Luminar of misappropriating an image of Lidwave's PIC technology to pass off as Luminar's own during the Company's Luminar Day investor conference, as well as in other materials on the Company's website and online. The article also revealed

that, based on this misconduct, Lidwave had threatened Luminar with legal action.

The article stated the following, in relevant part:

> **Luminar… is accused of passing off a next-generation chip design created by a rival as its own technology after showing an image of the processor at a recent investor conference and in materials on its website.** Lidwave, the Israeli startup making the claim, says it plans to take legal action over the matter.

> **The image, identified as a [PIC] by Luminar in its February 28 conference and webcast with no reference to Lidwave, looks identical to a chip on Lidwave's website that is its core technology.** The Jerusalem-based company sent a cease-and-desist letter to Luminar on March 14 asking it to remove the image. It also notified the [SEC] of Luminar's "misuse of its product image to falsely promote its abilities and securities to investors."

> Lidwave said it hadn't received a response from the company as of 3 p.m. New York time on Friday.

> \*\*\*

> **"Integrated photonics allows lidar to become as scalable and profitable as anybody has imagined. . . . But surprisingly, the picture Luminar presented of a [PIC] as their solution is not their solution, but basically the exact image of our lidar,"** Lidwave CEO Yehuda Vidal told Forbes. "**We will continue with a lawsuit if needed because it's a very huge problem for us. Some of our customers are very confused about what we do versus what they do.**"

> \*\*\*

> The image appeared during a presentation by Mike McCauliffe, head of Luminar's semiconductor team. The full Luminar Day webcast on YouTube, which had nearly 750,000 views, was taken down and removed from the company's website.

> "We have removed and replaced that image with an image of a new Luminar Semiconductor [PIC]," company spokesman Milin Mehta told Forbes. "It was inconsequential to the presentation."

(Emphasis added.)

81.    The *Forbes* article also included a picture of Defendant McAuliffe's presentation —with the relevant image of Lidwave's PIC displayed—during the Luminar Day investor conference:



Mike McCauliffe, head of Luminar's'semiconductor team, discusses the company's chip strategy during its February 28 investor conference.  LUMINAR VIA YOUTUBE

82.    Additionally, the *Forbes* article included an image of Lidwave's PIC as shown on its website, further indicating that it was Lidwave's PIC that was displayed in the Company's Luminar Day presentation materials:



Lidwave's integrated photonics chip.  LIDWAVE

83.     The *Forbes* article further discussed how development of sleeker, smaller, and simpler Lidar components, like Lidwave's PIC, had become crucial for companies developing Lidar and Lidar-enabling technologies as a way to manage costs and facilitate economies of scale associated with their production. The *Forbes* article also emphasized that this was especially true for Luminar's business because the Company "is poised to be the biggest supplier of the technology by driving down the cost dramatically in the years to come." The *Forbes* article stated the following, in relevant part:

> Lidar's ability to create detailed, 3-D maps of a vehicle's surroundings using lasers has made it a core technology in the race to perfect self-driving cars and trucks. But it's also relatively expensive, with individual units costing thousands of dollars each. Luminar, which has high-volume supply agreements with automakers including Mercedes-Benz, Volvo, Nissan, Polestar, China's SAIC and truck maker Daimler, is poised to be the biggest supplier of the technology by driving down the cost dramatically in the years to come.

- 41 -

Over the past five years, Orlando-based Luminar, created by optics prodigy (and Forbes 30 Under 30) alum Austin Russell moved from being one of dozens of lidar startups vying to challenge Velodyne, the first company to commercialize the technology for autonomous vehicles, to the de facto industry leader, in terms of the number of vehicles that will be using its sensors. Russell told *Forbes* last month that he intends to have Luminar lidar in "millions of vehicles on the road within a few years."

\*\*\*

Processing vast amounts of data collected by laser sensors requires ever more powerful chips that must also be cheaper and easier to produce. Lidwave's Vidal said that is exactly what his company, formed in 2019 and hoping to begin commercial deliveries in 2024, is working to perfect.

"The main problem holding back wide-scale adoption of lidar is its cost resulting from extremely complex microprecision assembly. Today there is no lidar producer that's conclusively solved the economy-of-scale (production) challenge," he said. "A photonic integrated chip platform is basically the Holy Grail for lidar."

84.     Accordingly, Luminar had a clear incentive to represent its PIC technology as being the sleeker, smaller, simpler, and more cost-efficient design compared to its competitors'.

85.     Upon the *Forbes* article being published, the Company's stock price fell $0.78 per share, or 9.09%, over two consecutive trading days, from closing at a price of $8.58 per share on March 16, 2023 to close at $7.80 per share on March 20, 2023.

86.     Furthermore, after being threatened with legal action by Lidwave, the Company removed the Relevant Image from its presentation materials and website, and further removed the YouTube video of the Luminar Day presentation which prominently displayed the Relevant Image.

87.     Moreover, in updating its Luminar Day presentation materials, Luminar replaced the Relevant Image with a microscopic black-and-white image of Luminar's own PIC technology. The new image was unclear, thereby leaving investors confused as to whether the replacement was an image of Luminar's entire PIC or just an individual section of the chip. Notably, the replaced image depicted a far bulkier PIC design that was less appealing to Company investors than the Relevant Image (which, as noted, depicted Lidwave's PIC design):



(Image of Luminar's PIC appears as the rightmost image at the bottom of the amended investor presentation slide)

## DAMAGES TO LUMINAR

88.     As a direct and proximate result of the Individual Defendants' conduct, Luminar will lose and expend many millions of dollars.

89.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

90.     Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

91.     Such expenditures also include losses of revenue caused by customers' loss of trust in the Company's business and products.

92.     Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

93.     As a direct and proximate result of the Individual Defendants' conduct, Luminar has also suffered and will continue to suffer a loss of reputation and goodwill,

and a "liar's discount" that will plague the Company's stock price in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

94.    Plaintiffs bring this action derivatively and for the benefit of Luminar to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Luminar, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

95.    Luminar is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

96.    Plaintiffs are, and have been at all relevant times, shareholders of Luminar. Plaintiffs will adequately and fairly represent the interests of Luminar in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY

97.    Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

98.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of the commencement of this action, the Board consisted of the following eight

individuals: Defendants Russell, Gores, Heng, Jepsen, Maguire, Martin, Simoncini, and Tempesta (the "Director-Defendants"). Plaintiffs need only to allege demand futility as to four of these eight Director-Defendants.

99.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

100.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Luminar to issue materially false and misleading statements. Specifically, the Director-Defendants caused Luminar to issue false and misleading statements which were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

101.     Additional reasons that demand on Defendant Russell is futile follow. Defendant Russell has served as the Executive Chairman of the Board and as a

Company director since December 2020. As such, the Company provides Defendant Russell with his principal occupation for which he receives lucrative compensation. Moreover, Defendant Russell is a controlling shareholder of the Company, possessing 78.2% of its total voting power. Thus, as the Company admits, Defendant Russell is a non-independent director. As Luminar's CEO and as one of its trusted directors, Defendant Russell was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period, including any and all which involved Luminar's use of the Relevant Image. As the trusted Board Chairman, Defendant Russell conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Russell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

102.    Additional reasons that demand on Defendant Gores is futile follow. Defendant Gores has served as a Company director since December 2020. Defendant Gores has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements,

consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Gores breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

103.    Additional reasons that demand on Defendant Heng is futile follow. Defendant Heng has served as a Company director since June 2021. He also serves as a member of the Audit Committee and the Compensation & Human Capital Management Committee. Defendant Heng has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Heng breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

104.    Additional reasons that demand on Defendant Jepsen is futile follow. Defendant Jepsen has served as a Company director since February 2021. She also serves as Chair of the Nominating & ESG Committee and as a member of the

Compensation & Human Capital Management Committee. Defendant Jepsen has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Jepsen breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

105.    Additional reasons that demand on Defendant Maguire is futile follow. Defendant Maguire has served as a Company director since June 2021. He also serves as a member of the Nominating & ESG Committee. Defendant Maguire has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Maguire breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

106.    Additional reasons that demand on Defendant Martin is futile follow. Defendant Martin has served as a Company director since February 2021. She also serves as Chair of the Compensation & Human Capital Management Committee and as a member of the Nominating & ESG Committee. Defendant Martin has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Martin breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

107.    Additional reasons that demand on Defendant Simoncini is futile follow. Defendant Simoncini has served as a Company director since December 2020. He also serves as Chair of the Audit Committee and as a member of the Compensation & Human Capital Management Committee. Defendant Simoncini has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and

consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Simoncini breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

108.    Additional reasons that demand on Defendant Tempesta is futile follow. Defendant Tempesta has served as a Company director since August 2022. He also serves as a member of the Audit Committee. Defendant Tempesta has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Tempesta breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

109.    Additional reasons that demand on the Board is futile follow.

110.    Defendants Simoncini, Heng, and Tempesta (collectively the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the

Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

111.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants

breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

112.   Luminar has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or any others who were responsible for that wrongful conduct to attempt to recover for Luminar any part of the damages Luminar suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

113.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

114.   The acts complained of herein constitute violations of fiduciary duties owed by Luminar's officers and directors, and these acts are incapable of ratification.

115. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Luminar. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Luminar, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

116. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Luminar to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

117. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a

demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

118.   Plaintiffs incorporate by reference and re-allege the allegations set forth in paragraphs one (1) through one hundred seventeen (117) as though fully set forth herein.

119.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Luminar's business and affairs.

120.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

121.   The Individual Defendant's conduct set forth herein was due to their intentional or reckless breach of fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Luminar.

122.   Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Luminar's business,

operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) the Company attempted to pass off an image of a competitor's PIC as its own in order to market its products; (ii) such conduct created a significant risk for Luminar of litigation and/or regulatory enforcement actions; (iii) once revealed, the foregoing would detrimentally affect Luminar's business, reputation, and stock price; and (iv) the Company failed to maintain internal controls. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

123.   The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

124.   Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

125.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein,

and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Luminar's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

126.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

127.    As a direct and proximate result of the Individual's Defendants' breaches of their fiduciary obligations, Luminar has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

128.    Plaintiffs, on behalf of Luminar, have no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Unjust Enrichment

129.    Plaintiffs incorporate by reference and re-allege the allegations set forth in paragraphs one (1) through one hundred seventeen (117) as though fully set forth herein.

130. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Luminar.

131. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Luminar that was tied to the performance or artificially inflated valuation of Luminar, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

132. Plaintiffs, as shareholders and representatives of Luminar, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

133. Plaintiffs, on behalf of Luminar, have no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

134.   Plaintiffs incorporate by reference and re-allege the allegations set forth in paragraphs one (1) through one hundred seventeen (117) as though fully set forth herein.

135.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Luminar, for which they are legally responsible.

136.   As a direct and proximate result of the Individual Defendants' abuse of control, Luminar has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Luminar has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

137.   Plaintiffs, on behalf of Luminar, have no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

138.   Plaintiffs incorporate by reference and re-allege the allegations set forth in paragraphs one (1) through one hundred seventeen (117) as though fully set forth herein.

139.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Luminar in a manner consistent with the operations of a publicly held corporation.

140.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Luminar has sustained and will continue to sustain significant damages.

141.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

142.    Plaintiffs, on behalf of Luminar, have no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

143.    Plaintiffs incorporate by reference and re-allege the allegations set forth in paragraphs one (1) through one hundred seventeen (117) as though fully set forth herein.

144.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Luminar to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

145.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

146.   Plaintiffs, on behalf of Luminar, have no adequate remedy at law.

## SIXTH CLAIM
### Against Defendant McAuliffe for Contribution Under Sections 10(b) and 21D of the Exchange Act

147.   Plaintiffs incorporate by reference and re-allege the allegations set forth in paragraphs one (1) through one hundred seventeen (117) as though fully set forth herein.

148.   Luminar and Defendant McAuliffe are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant McAuliffe's willful and/or reckless violations of his obligations as an officer of Luminar.

149.   Defendant McAuliffe, because of his position of control and authority as an officer of Luminar, was able to and did, directly, and/or indirectly, exercise control over the business and corporate affairs of Luminar including the wrongful acts complained of herein and in the Securities Class Action.

150.    Accordingly, Defendant McAuliffe is liable under 15 U.S.C § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act

151.    As such, Luminar is entitled to receive all appropriate contribution or indemnification from Defendant McAuliffe.

## **REQUEST FOR RELIEF**

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of Luminar, and that Plaintiffs are adequate representatives of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Luminar;

(c)    Determining and awarding to Luminar the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Luminar and the Individual Defendants to take all necessary actions to reform and improve Luminar's corporate governance and internal procedures to comply with applicable laws and to protect Luminar and its shareholders from a repeat of the damaging events described herein, including, but not limited to,

putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking the following actions as may be necessary to ensure proper corporate governance policies:

> 1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

> 2. a provision to permit the shareholders of Luminar to nominate at least four candidates for election to the Board; and

> 3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Luminar restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated: October 21, 2023

C.

**LAW OFFICE OF JOSE D. SOSA, P.C.**
1141 Via Jardin
Palm Beach Gardens, FL 33418
Tel.: **(**561) 670-8237
Email: pepe@pepesosalaw.com
        sosalaw@yahoo.com

 /s/  *Jose D. Sosa*
JOSE D. SOSA
Florida Bar No.: 150878

and

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
To Appear *Pro Hac Vice* Upon Court Order
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
To Appear *Pro Hac Vice* Upon Court Order
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
        eitank@bgandg.com

*Counsel for Plaintiffs*

- 64 -